FLEX–FOOT, INC. and Van L. Phillips, Plaintiffs–Appellees,

v.

CRP, INC. (doing business as Springlite), Defendant–Appellant.

No. 99–1489.

United States Court of Appeals, Federal Circuit.

Feb. 2, 2001.

Brenton R. Babcock, Knobbe, Martens, Olson & Bear, LLP, of Newport Beach, California, argued for plaintiffs-appellees. With him on the brief was Darrell L. Olson.

Paul S. Malingagio, Sheppard, Mullin, Richter & Hampton LLP, of Los Angeles, California, argued for defendant-appellant. With him on the brief were Gary A. Clark, and Jeanine L. Hayes.

Before MAYER, Chief Judge, PLAGER, Senior Circuit Judge,* and LINN, Circuit Judge.

LINN, Circuit Judge.

CRP, Inc. d/b/a Springlite ("Springlite") appeals the district court's entry of judg-

* Judge Plager assumed senior status on No-

ment confirming an arbitration award, its holding that Springlite is collaterally estopped from presenting its patent invalidity defenses and counterclaim, and its entry of judgment in favor of Flex–Foot, Inc. and Van L. Phillips (collectively "Flex–Foot") for an injunction and an award of costs. *See Flex–Foot, Inc. v. CRP, Inc.,* SACV 97–504 DOC (C.D. Cal. entered June 11, 1999). Because the district court did not err in affirming the arbitration award or entering judgment in favor of Flex–Foot, we affirm.

## BACKGROUND

This is the third litigation between Springlite and Flex Foot regarding U.S. Patent No. 4,822,363 (the "'363 patent"). In 1989, Flex–Foot brought the first lawsuit against Springlite for infringement of the '363 patent. That action was promptly settled and dismissed by way of a settlement agreement and a corresponding license agreement in which Springlite agreed to pay a royalty on the accused Springlite device.

Springlite contends that its primary motivation in settling with Flex–Foot at that time was economic. Springlite did not have the financial resources to defend against Flex–Foot's infringement claims. Neither the settlement agreement nor the license agreement acknowledged that Springlite's device infringed the '363 patent. In addition, neither agreement barred Springlite from later challenging the validity of the '363 patent. In fact, the license expressly provided that it would expire upon judicial determination that the '363 patent was invalid.

Springlite brought a second action in 1993 (the "DJ action"), seeking a declaration that the '363 patent was invalid. The parties thereafter conducted discovery and fully briefed a motion for summary judgment regarding Springlite's invalidity allegations. While that motion was pending, however, the parties settled the case

vember 30, 2000.

in March 1994 via another settlement agreement (the "March 1994 Settlement Agreement") and corresponding license agreement (the "March 1994 License Agreement").

The March 1994 Settlement Agreement contains language making it clear that Springlite waived its right to challenge the validity and enforceability of the '363 patent. Specifically, paragraph 7.1 states:

> 7.1 The CRP Group agrees not to challenge or cause to be challenged, directly or indirectly, the validity or enforceability of the '913 patent and/or the '363 patent in any court or other tribunal, including the United States Patent and Trademark Office. As to the '363 and '913 patents only, the CRP Group waives any and all invalidity and unenforceability defenses in any future litigation, arbitration, or other proceeding. This waiver applies to any product made, used, or sold by the CRP Group or any of their assignees, successors or those who act for or in concert with any of them at any time during the life of either the '363 or '913 patents.[1]

In addition, paragraph 6 of the March 1994 License Agreement states:

> CRP agrees not to challenge or cause to be challenged, directly or indirectly, the validity or unenforceability, or scope of the '913 patent and/or the '363 patent in any court or tribunal, or before the United States Patent and Trademark Office or in any arbitration proceeding. This waiver is expressly limited to challenges to the '363 and '913 patents, but applies without exception to any and all products which CRP may make, use or sell in the future. CRP also waives any argument that the licensed products are not covered by one or more claims of the '913 or '363 patent.

The March 1994 Settlement Agreement also required arbitration of any infringement claims. Pursuant to the March 1994 Settlement Agreement and the March

1994 License Agreement, the parties entered into a stipulation for dismissal of the DJ action with prejudice.

In 1997, Flex–Foot filed a complaint alleging that Springlite's "G–Foot" prosthetic foot device infringed the '363 patent (the "1997 Complaint"). In accordance with the March 1994 Settlement Agreement, the 1997 Complaint was sent to arbitration. In January 1999, Flex–Foot successfully obtained an arbitration award from the American Arbitration Association ("AAA"). That decision, rendered by a panel of three patent attorneys mutually selected by the parties, found that the accused Springlite device literally infringed asserted claims 16 and 17 of the '363 patent. The arbitration panel awarded Flex–Foot the costs of the arbitration. Soon thereafter, Springlite requested that the arbitrators clarify or modify their award, as well as set forth clear statements about the scope of the contested claim elements. The arbitrators declined both requests.

As a defense to the charge of infringement in the 1997 Complaint, Springlite alleged invalidity of the '363 patent, and subsequent to the arbitrators' award, filed a motion with the district court to vacate the award and consider the invalidity defense. In response, Flex–Foot filed a motion to affirm the arbitration award. The district court granted Flex–Foot's motion to confirm the arbitration award and entered a permanent injunction against Springlite, concluding that Springlite was "collaterally estopped" from challenging the validity and enforceability of Flex–Foot's '363 patent.

Springlite appeals the arbitration panel's award and the district court's judgment to this court. We have jurisdiction over Springlite's appeal from the district court's judgment pursuant to 28 U.S.C. § 1295(a)(1) (1994).

---

1. The '913 patent (U.S. Patent No. 4,547,913) is another Flex–Foot patent not at issue in this appeal.

## DISCUSSION

### I. Standard of Review

■ When reviewing district court decisions upholding arbitration awards, we accept findings of fact that are not clearly erroneous and decide questions of law de novo. *See First Options v. Kaplan,* 514 U.S. 938, 948, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

In 1982, Congress enacted provisions that allow parties to make the enforcement provisions of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("Arbitration Act") applicable to patent contracts (e.g., settlement and licensing agreements). 35 U.S.C. § 294 (1994). As a result, the Arbitration Act is clearly applicable to the arbitration award challenged by Springlite. Thus, the district court's review of the arbitration award must be in accordance with the Arbitration Act.

Under the Arbitration Act, the grounds for vacating an arbitration award are limited. The Arbitration Act sets forth four grounds for which a district court may vacate an arbitration award: (1) fraud in procuring the award; (2) partiality on the part of the arbitrators; (3) gross misconduct by the arbitrators; and (4) the failure of the arbitrators to render a mutual, final, and definite decision. 9 U.S.C. § 10 (1994); *see Wilko v. Swan,* 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (citing 9 U.S.C. § 10 for the proposition that the power to vacate an arbitration award is limited) *overruled on other grounds by Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Gross misconduct is statutorily defined as, among other things, "any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3) (1994). In addition to the four above-listed statutorily defined bases for vacating an arbitration award, the *Wilko* Court observed that an arbitration award may be vacated if it is in "manifest disregard" of the law. 346 U.S. at 436–37, 74 S.Ct. 182.

■ We are also faced with the question of whether to apply Federal Circuit, Ninth Circuit, or California law to the parties' claims. We answer this question on an issue by issue basis, and will apply the law of the regional circuit to which the district court appeal normally lies unless "the issue pertains to or is unique to patent law," in which case we will apply our own law to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." *Amana Refrigeration, Inc. v. Quadlux, Inc.,* 172 F.3d 852, 855–56, 50 USPQ2d 1304, 1307 (Fed.Cir.1999) (citations omitted) (affirming district court's analysis of personal jurisdiction on state law trade libel and defamation claims under Eighth Circuit law and analyzing mootness of declaratory judgment of patent invalidity and noninfringement under Federal Circuit law).

■ Although Springlite's arguments, seeking vacation of the arbitral award based on the insufficiency of the arbitrators' written opinion and challenging as against public policy its waiver of claims and defenses in a settlement agreement, are arguably procedural issues for which guidance is adequately provided by regional circuit law, the underlying substance of these arguments (respectively, whether patent law dictates that an arbitrator must set forth the full scope of claim terms in claims construction and whether public policy precluding patent license estoppel should extend to a waiver of validity challenges in a settlement agreement) is intimately related with the substance of enforcement of a patent right. Therefore, we will apply our law to these issues. However, Springlite's challenge to the award of arbitration fees and the arbitrators' jurisdiction to award such fees is a matter of state contract law interpretation and federal arbitration law that is neither "unique to patent law" nor "intimately involved" in its substance. *See, e.g., American Medical Systems, Inc. v. Medical Engineering Corp.,* 6 F.3d 1523, 1532, 28 USPQ2d 1321, 1327 (Fed.Cir.1993) ("State law ... controls in matters of contract law and interpretation" ). Therefore, we will

apply California state and Ninth Circuit law on this issue.

## II. Analysis

### A

■ Springlite argues that the arbitrators' award demonstrates a failure by the arbitrators to execute their powers and a manifest disregard of the law, because it ignores the necessary step of claim construction. Springlite contends that express findings regarding the scope of each asserted patent claim are essential under both the law and the March 1994 Settlement Agreement.

Paragraph 8.4 of the March 1994 Settlement Agreement states that "[a]ny decision by arbitration shall be limited to the issue of whether a product made, used or sold ... falls within the scope of patent claims of any patent ..." Paragraph 8.5 of the settlement agreement states that "[t]he arbitrator(s) will be required by the parties to write a formal written opinion and decision." Springlite alleges that the language of paragraph 8.5 of the settlement agreement must be combined with the language of paragraph 8.4 to require that the arbitrators make a written determination of patent scope.

The district court doubted whether paragraphs 8.4 and 8.5 of the March 1994 Settlement Agreement combine to create a requirement that the arbitrators make a written determination of patent scope. Even so, the district court found that the arbitrators' written decision sets forth the two-part test for patent infringement and specifically addresses each issue raised by the parties regarding patent scope.

In view of the foregoing, the district court held that the arbitrators' written decision is "adequate and certainly not 'completely irrational' or in 'manifest disregard of the law'" under the applicable deference owed by the district court to the arbitrators' decision.

As stated above, the Arbitration Act sets forth four statutory grounds for which the district court could vacate the arbitration award: (1) fraud in procuring the award; (2) partiality on the part of the arbitrators; (3) gross misconduct by the arbitrators; and (4) the failure of the arbitrators to render a mutual, final, and definite decision. 9 U.S.C. § 10. In addition, *Wilko* states that an arbitration award may be vacated if it is in "manifest disregard" of the law. 346 U.S. at 436–37, 74 S.Ct. 182.

The district court held that the arbitrators' written decision is adequate, not completely irrational, and not in "manifest disregard" of the law. Thus, the district court's decision was consistent with the test set forth in *Wilko*. While the district court did not directly address the four grounds for which it could have vacated the arbitration award under the Arbitration Act, its decision was fully consistent with the statutory test. Springlite alleged neither fraud nor partiality on the part of the arbitrators, and the district court's holding, that the arbitrators' written decision is "adequate and certainly not 'completely irrational' or in 'manifest disregard of the law,'" clearly recognizes that the decision is not the product of the arbitrators' gross misconduct. As to the fourth factor of the statutory test, the arbitrators' award was clearly mutual, final, and definite.

Although the arbitrators' written decision lacks a thorough claim construction such as would be undertaken by a court, it discusses and defines a number of claim limitations. The written decision sets forth that asserted claims 16 and 17 of the '363 patent cover only a fully assembled prosthetic foot and not a kit for assembling a prosthetic foot. It therefore concludes that claims 16 and 17 neither require a plurality of lever arm length determining means nor require that the claimed means be separable from the assembled prosthetic foot.

In addition to the above discussion of claim scope, the written decision goes on to state that the parties articulated abbreviated arguments on the merits of their respective positions, and that, by agreement of the parties, the arguments were focused

on three claim limitations: (1) "secured"; (2) "lever arm length-determining means"; and (3) "adjacent said securement." A definition of the scope of each of the three claim limitations focused on by the parties follows thereafter.

Given the March 1994 Settlement Agreement's requirement that the arbitrators merely "write a formal written opinion," and given the arbitrators' definition of the scope of each of the three claim limitations focused on by the parties, the district court found that the written decision sufficiently sets forth the reasoning of the arbitrators. As we noted above, the Arbitration Act sets forth that the decision of the arbitration panel is entitled to great deference by the district court. *See* 9 U.S.C. § 10. In view of the foregoing, we cannot say that the district court erred as a matter of law or made clearly erroneous factual findings in upholding the award as adequate under both the law and the March 1994 Settlement Agreement.

### B

■ The arbitration panel held that, pursuant to paragraph 8.7, it had jurisdiction to determine the allocation of arbitration fees. It thus held that Springlite should bear the administrative fees and expenses of the arbitration, as well as the arbitrators' compensation. The district court affirmed these holdings.

We need not address the parties' arguments as to the correctness of the award of arbitration fees and costs under the March 1994 settlement agreement. The record reveals that in 1997, during the course of the arbitration, the parties independently agreed to grant the arbitrators the authority to award arbitration fees and expenses. *See* 8/12/97 agreement, paragraph 5 ("The Arbitrators shall include in their award a provision allocating all fees and expenses, including Arbitrator's Compensation and expenses, pursuant to paragraph 1 above, incurred in the conduct of

the arbitration.") The stipulation is a binding agreement and subject to the ordinary rules employed to interpret contracts. *Sy First Family Ltd. Partnership v. Cheung*, 70 Cal.App.4th 1334, 1341, 83 Cal. Rptr.2d 340, 344 (1999) (citing *Palmer v. City of Long Beach*, 33 Cal.2d 134, 142, 199 P.2d 952 (1948); *Porreco v. Red Top RV Ctr.*, 216 Cal.App.3d 113, 119, 264 Cal. Rptr. 609 (1989)). Because these 1997 agreements clearly and expressly indicate an intent of the parties to grant the arbitrators jurisdiction to award and allocate their fees and expenses, we therefore affirm the panel's award.

### C

■ The arbitration award did not address Springlite's challenge to the validity of the '363 patent. Upon finding its jurisdiction under the Arbitration Act, 9 U.S.C. § 9, and reviewing the award, the district court held that the validity of Flex–Foot's patents could not be litigated. It so held because it determined that Springlite was collaterally estopped from challenging the validity of the '363 patent, based on paragraph 7.1 of the March 1994 Settlement Agreement and paragraph 6 of the March 1994 Licensing Agreement.

■ Springlite argues that the district court's holding—that it is collaterally estopped from challenging the validity of the '363 patent—is in error. Springlite contends that it did not agree to enter into any type of judgment adjudicating the issues of infringement and validity. Despite Springlite's protestations, we note that Springlite did agree to a dismissal *with prejudice* following a settlement agreement that included a promise that Springlite would not challenge the validity of the '363 patent. We hold that while the foregoing does not give rise to "collateral estoppel"[2], such a dismissal with prejudice and accompanying settlement agreement certainly gives rise to contractual estoppel

---

2. Collateral estoppel is "an affirmative defense barring a party from relitigating an issue *determined against that party* in an earlier

action, even if the second action differs significantly from the first one." Black's Law Dictionary 256 (7th ed.1999) (emphasis added).

of Springlite's challenge to the '363 patent's validity. The question is whether such contractually created estoppel is void as against public policy pursuant to *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

Springlite does not contend that its intent in entering into the March 1994 Settlement Agreement and March 1994 Licensing Agreement was anything other than a waiver of future challenges to the '363 patent's validity. Instead, Springlite argues that it should be entitled, under the public policy rationale set forth in *Lear*, to renege on its prior written agreement with Flex–Foot. .

Prior to *Lear*, a licensee operating under a license agreement was estopped from denying the validity of the licensed patent in a suit for royalties under the agreement. *See Lear*, 395 U.S. at 656, 89 S.Ct. 1902. The theory underlying this doctrine was that a licensee should not be permitted to enjoy the benefits of the agreement while simultaneously urging that the patent forming the basis of the agreement is void. *See id.* In *Lear*, the Supreme Court overruled this doctrine of licensee estoppel, holding that "the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain" trumps "the technical requirements of contract doctrine." *Id.* at 670, 89 S.Ct. 1902. However, this holding with respect to licensee estoppel is meaningfully distinguishable from the present case concerning a settlement agreement and a resulting dismissal of a pending DJ action with prejudice.

The license agreement in *Lear* was not created as part of a litigation settlement. Adkins was hired by Lear to develop improved gyroscopes that satisfied the needs of faster airplanes. *See id.* at 657, 89 S.Ct. 1902. Adkins and Lear entered into a one-page agreement stating that all inventions were the property of Adkins, who promised to license the inventions to Lear for an appropriate royalty amount. *See id.* Adkins conceived of an improved method for producing gyroscopes, which was im-

mediately incorporated into Lear's production process. *See id.* at 655, 89 S.Ct. 1902. Adkins sought a patent on this improvement by filing an application with the U.S. Patent and Trademark Office ("PTO"). Adkins thereafter (but prior to receiving his patent) successfully negotiated a license with Lear. *See id.* at 657, 89 S.Ct. 1902. It took the PTO almost 6 years to issue Adkins' patent, and in that time Lear became convinced no patent would issue. More than two years into prosecution of Adkins' patent, Lear announced that it had searched for and found a patent that it believed fully anticipated Adkins' patent. Because Lear believed Adkins' improvement was not novel, it stopped paying royalties under the license. *See id.* at 659, 89 S.Ct. 1902. When Adkins finally received his patent, he brought a suit for breach of the license contract. Lear raised patent invalidity as a defense. Applying the doctrine of licensee estoppel, the California trial and appellate courts held that Lear was estopped from challenging the validity of the patent because it was a licensee under the patent. *See id.* The Supreme Court reversed the California courts, thereby abrogating licensee estoppel.

In *Lear*, notably, the license did not contain, and was not accompanied by, any promise by the licensee not to challenge the validity of the patent. This distinguishing fact is meaningful because it implicates the important policy of enforcing settlement agreements and res judicata. Indeed, the important policy of enforcing settlement agreements and res judicata must themselves be weighed against the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain.

In addition to the present case being meaningfully distinguishable., from *Lear*, we note that this court has in the past distinguished a number of other cases from *Lear. See Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 7 USPQ2d 1502 (Fed.Cir. 1988); *Foster v. Hallco Mfg. Co.*, 947 F.2d

469, 20 USPQ2d 1241 (Fed.Cir.1991); *Studiengesellschaft Kohle M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 42 USPQ2d 1674 (Fed. Cir.1997).

*Hemstreet* concerns settlement of an infringement trial that had progressed for a single week. 851 F.2d at 349, 7 USPQ2d at 1503. The settlement, which included a stipulation requiring the licensee to make payments without regard to any subsequent determination of invalidity or unenforceability, was memorialized in a settlement order signed by the parties' representatives and the district court. *Id.* The court's settlement order dismissed the action and stated that "the issues of validity, unenforceability and infringement of" the patents were finally concluded and disposed of. In a subsequent lawsuit, the parties disputed whether the settlement order created res judicata. *Id.* We held that a dismissal based upon a settlement order in which " 'the issues of validity, enforceability and infringement of' the patents in suit were finally concluded and disposed of," barred a subsequent challenge to the validity and enforceability of those patents by the same party, whether or not the settlement order and dismissal actually adjudicated patent validity to create res judicata. *Id.* at 349–50, 851 F.2d 348, 7 USPQ2d at 1503–04. We also stated, "[t]here is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into" because enforcement of settlement agreements encourages parties to enter into them—thus fostering judicial economy. *Id.* at 350, 851 F.2d 348, 7 USPQ2d at 1504.

Thus, the holding in *Hemstreet* was premised on the policy that while the federal patent laws favor full and free competition in the use of ideas in the public domain over the technical requirements of contract doctrine, settlement of litigation is more strongly favored by the law. *See id.* Clearly, the importance of res judicata and its hierarchical position in the realm of public policy was not a relevant consideration in *Lear* and therefore the Supreme

Court never evaluated the importance of res judicata and whether it trumps the patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain. *See id.*

This court had the occasion to revisit *Lear*'s holding in *Foster*. *Foster* concerns termination of an infringement suit via a consent decree, *i.e.*, a decision by the court to which the parties have agreed. 947 F.2d at 472, 20 USPQ2d at 1243. In the consent decree, Foster acknowledged the validity and infringement of the patents at issue. *See id.* About four years after entry of the consent decree, Foster began making a new device, and informed the patentee Hallco that the device did not infringe the patents at issue in the prior litigation. Hallco disagreed. When Foster subsequently filed a declaratory judgment action that the patents were invalid and unenforceable, Hallco asserted an affirmative defense of res judicata, based on the consent decree declaring that the patents are valid and enforceable. *See id.* at 473, 947 F.2d 469, 20 USPQ2d at 1243. Foster alleged that, because the consent decree was essentially an agreement not to challenge the patent, it therefore was unenforceable under *Lear*. *See id.*

We held that *Lear*'s abrogation of licensee estoppel did not change the fact that a consent decree gives rise to res judicata. *See id.* at 476, 20 USPQ2d at 1246. The *Foster* court could not conclude that the public policy expressed in *Lear* is so overriding that challenges to validity must be allowed when, under normal principles of res judicata applicable to a consent judgment, such judgment would be precluded. *See id.* at 477, 20 USPQ2d at 1247. *Foster* echoes *Hemstreet*'s teaching that there is a strong public interest in settlement of patent litigation and that upholding the terms of a settlement encourages patent owners to agree to settlements—thus fostering judicial economy. *See id.* These interests are relevant to the instant case, even though this case deals with a settlement agreement and resulting dismissal

with prejudice, rather than a consent decree.

We note that this is the third litigation between Flex–Foot and Springlite. Springlite has already challenged the validity of the '363 patent twice, voluntarily ending that challenge via settlement and licensing agreements on both occasions. In the latest settlement agreement, Springlite promised not to challenge the validity and enforceability of the '363 patent. There has been no allegation that the latest settlement was anything other than a voluntary waiver of future challenges to the '363 patent's validity. Moreover, in this challenge, the parties conducted discovery and fully briefed opposing summary judgment motions on the issue of invalidity. The latest settlement occurred on the eve of the summary judgment briefing. Indeed, Springlite's behavior is exactly the type of behavior that both *Hemstreet* and *Foster* were concerned with when they noted the strong public interest in enforcing settlements. Settlement agreements must be enforced if they are to remain effective as a means for resolving legal disagreements. Upholding the terms of settlement agreements encourages patent owners to agree to settlements and promotes judicial economy.

■ Once an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

Based on the clear and unambiguous waiver of future challenges to the validity of the '363 patent in the settlement agreement voluntarily entered into by the parties in this case, we hold that Springlite is contractually estopped from challenging the validity of the '363 patent and affirm the district court's judgment in favor of Flex–Foot.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*AFFIRMED.*